CLERK'S OFFICE U.S. DISTRICT. COURT
AT HARRISONBURG, VA
FILED

JAN 25 2023

LAURA A. AUSTIN, CLERK
BY:
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### Harrisonburg Division

**JAMES B. SHERWOOD**          )
                              )
          Plaintiff,          )
                              )
**v.**                        )          Civil Action No. 5:23-CV-5
                              )
**VALLEY HEALTH SYSTEM,**     )
                              )
          Defendant.          )

## COMPLAINT

Plaintiff, James B. Sherwood ("Sherwood," "Plaintiff," or "employee"), by counsel, hereby files this Complaint against Defendant, Valley Health System ("VHS," "Defendant," or "employer"), stating as follows:

### INTRODUCTION

1.     Plaintiff seeks the balance of his severance benefits and to declare and find VHS's non-compete provisions, under "Disqualifying Activities" incorporated under its Secondary Severance and Release Agreement ("SSRA") and as set forth in Exhibit A of the Valley Health Severance Benefit Plan ("Plan"), is violative of Virginia law. The SSRA states, at section 5.11, "Governing Law," that said agreement "shall be governed by, interpreted, construed and enforced in accordance with the laws of the Commonwealth of Virginia." *See also* Par. 10.6 of the Plan. Further, VHS's payment of severance benefits to Sherwood is not otherwise governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA").

2.     Due to the nature of the highly restrictive language in said Initial Severance and Release Agreement, the SSRA and the Plan and liquidated damages that appear pertaining to the

1

allegations of this Complaint, Sherwood moves this Court to seal this Complaint as more fully set forth in an accompanying Motion.

3.      In the alternative, pursuant to the BRISA (29 U.S.C. § 1132(a)(l)(B)), and without conceding that BRISA applies to the specific claim herein, Sherwood is seeking the remaining balance of $118,750.00 owed to him in severance benefits by VHS, as the non-compete is not covered by BRISA, and, if it is, this Court is asked to find and review *de novo* to determine credibility and to weigh the relevant evidence in this case that, due to material facts in dispute, VHS's decision denying Sherwood his remaining severance benefits is arbitrary and capricious, unreasonable, and an abuse of discretion due to structural conflict of interest in VHS both evaluating Sherwood's severance benefit claim and paying said benefits from a common, yet specifically unfunded, source, and which decision lead to VHS's denial of the balance of Sherwood's severance benefits under its severance benefit plan as more fully set forth below.

## PARTIES

4.      Plaintiff, James B. Sherwood, is a natural person and is now domiciled in and a resident of Frederick, Maryland.

5.      Defendant, VHS, is a non-stock Virginia corporation domiciled in the County of Winchester, Virginia. VHS is a not-for-profit health system made up of hospitals, urgent cares, and physician practices that provides services in the Shenandoah Valley, Virginia, West Virginia and has a minor lab and urgent care facility on or near the border of Virginia, in Hanover, Maryland.

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction for this action pursuant to 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy in this civil action, exclusive of interest and costs, exceeds the sum or value of $75,000.00.

7.     This Court, alternatively, also has jurisdiction for this action pursuant to 28 U.S.C.

Sec. 1331 and 29 U.S.C. Sec. 1132 (e) as this action is alleged by the Defendant founded on claims

or rights under the laws of the United States, specifically the application of ERISA, as Sherwood

seeks interpretation and enforcement of his rights under the Defendant's Severance Benefit Plan

governed by ERISA §502(a),  pursuant to 29 U.S.C. Sections 1132 (a) and 1144 (a).

8.     Venue is appropriate in this specific Court, as the Defendant's Secondary Severance

and Release Agreement so states at 5.11 "Convenient Forum," and further VHS's corporate

headquarters is located in Winchester, Virginia, within the boundaries of the United States District

Court, Western District of Virginia, Harrisonburg Division.

### FACTS

### A.     Plaintiff's work history

9.     Sherwood began his employment and career in the medical services field in the

U.S. Air Force as a medic in 1988 and a nurse in 1994, and in hospital administration in 1999 after

graduating with a master's degree in health administration from Trinity University in San Antonio,

Texas.

10.    During this time, Sherwood along with Kevin Curtis were known as the best

cardiovascular management consultants in the country while employed at John Goodman and

Associates.

11.    From 2005, Sherwood worked for Bon Secours Richmond Health System as a Vice

President of Cardiovascular Services until July 2010 when he became a Senior Vice President,

Chief Administrative Officer in the Bon Secours Hampton Roads Virginia market until April 2014,

and, in those roles, he had a deep and broad medical health administration skill set.

# REDACTED REDACTED

13.    In August 2015, VHS hired Sherwood after he provided management consulting to

them with the VHS title as Vice President of Operations and Professional Services over Winchester

Medical Center ("WMC").

14.    To take the VHS job, Sherwood moved himself and his family (wife and two

children) from Suffolk to Winchester, Virginia in 2015, where he bought and built his then-new

home which was an expectation of taking the position. However, after the fact, it was found that

the expectation was applied to people inconsistently.

# REDACTED REDACTED

4

REDACTED

REDACTED



## B.    The VHS Severance Documents

23.    After Plaintiff was told of his "involuntary" termination in January 2021 as Vice President of Operations and Professional Services, VHS issued Sherwood an "Initial Severance Agreement" ("ISA") which continued his employment and salary, but ended his day-to-day

6

activities and provided for Sherwood's outplacement services between January and March 31, 2021. See Ex. B, VHS00048-56

24.     The ISA required Sherwood to release any rights to reinstatement (Par. 1.12) and release multiple legal claims against VHS and covenant not to sue VHS (Par. 3) and included provisions for non-disparagement and confidentiality (Par. 4) and liquidated damages of $10,000 per breach (Par. 4.1.5) in exchange for the relinquishment of his position and continuing to be paid his salary (Par. 2) until March 31, 2021. Said agreement per 5.11 is governed by the laws of the Commonwealth of Virginia (See Ex. B., VHS00055) and had liquidated damage provisions for any breach.

25.     After March 31, 2021, VHS issued Sherwood a Secondary Severance and Release Agreement ("SSRA"), which Sherwood executed on April 8, 2021, and Savage executed on April 16, 2021. See Ex. B, VHS00057-64.

26.     The SSRA had similar releases, and non-disparagement and confidentiality provisions, as the ISA, is governed by the laws of the Commonwealth per paragraph 5.11(VHS00063), had liquidated damage provisions for any breach and, further in exchange for signing, Sherwood would be entitled to severance benefits under the Plan restated January 1, 2021. See Plan at Ex. B, VHS00065-83.

27.     The Plan stated that VHS would pay six (6) months of Sherwood's base salary of $285,000 annually, or $23,750 per month, which is a total of $142,500. The Plan provided that Sherwood was a "Tier 3 Participant" and VHS would make the payments to Sherwood over a six-month period.

7

28.    Pursuant to Article 4 of the Plan, VHS would begin distributing payment and

benefits to Sherwood starting 45 days after Sherwood's separation from employment with VHS

on March 31, 2021.

29.    The Plan contains a Forfeiture Clause in Section 5.5 whereby Sherwood would

forfeit the benefits provided under the Severance Agreement if he engaged in any "Disqualifying

Activities" which is set out in Exhibit "A" of the Plan.

30.    Exhibit A of the Plan defined "Disqualifying Activities" as:

A Participant shall be engaged in Disqualifying Activities if he or she, directly or
indirectly, does any of the following:

***

Whether as a partner, officer, employee, manager, consultant, or otherwise, within
a 70-mile radius of Winchester Medical Center, performs services or consults with
respect to the performance of services in a Covered Capacity for any organization
that has any purpose or business activities of the Company or any division of the
Company, and which competes with the Company. Covered Capacity means: (i)
any capacity which involves the performance of tasks substantially similar to those
performed by the Participant for the Company at any time within eighteen months
(18) months immediately prior to the Involuntary Separation from Services; or (ii)
any capacity which involves the management or supervision of any function for
which the Participant was responsible while employed by the Company at any time
within the eighteen months (18) immediately prior to the Involuntary Separation
from Service.

See Ex. B, VHS00077.

31.    Pursuant to Paragraph 10.6 of the Plan: "The Plan and all rights hereunder shall be

governed by and construed according to the laws of Virginia." See Ex. B, VHS00075.

32.    The Non-Compete Provision contains no stated time limit, is vague, ambiguous,

and/or overbroad, and violative of the laws of Virginia governing non-competition agreements.

33.    Other "Disqualifying Activities" (Ex. B, VHS00077) include confidentiality

matters of proprietary information concerning patients, etc.; misrepresentation of past events of

8

VHS; non-disparagement and non-defamation of VHS or its employees; and non-solicitation. However, none of these issues have been raised by VHS in this matter. Rather, the whole of said covenants, restrictions and limitations, with no time limitations on Sherwood, are in place forever regardless of his receipt of actual severance benefit payments.

34.     Incident to VHS's elimination of Sherwood's position, VHS employed Wiederhold Associates, a job placement and consulting firm used by VHS that places and transitions medical industry professionals into new industry employment, to assist Sherwood with job placement services. VHS had previously used Wiederhold Associates or other similar outplacement companies in the same capacity for other employees who either were voluntarily seeking new employment or who had their positions eliminated by VHS.

35.     Sherwood, with the aid of Wiederhold Associates, and based on a specific referral from Philips and his connections with health care leaders in the State of Maryland, was introduced to Les Pitten ("Pitten"), President and CEO of the Healthcare Council and Share Source in Calverton, Maryland. Pitten in turn introduced Sherwood to Tom Kleinhanzl ("Klienhanzl"), CEO of Fredrick Health in Fredrick, Maryland.

36.     Sherwood and Klienhanzl met over the months of February and March 2021. During this period, Sherwood responded positively when asked by Klienhanzl if he would be interested in interviewing for the position of Vice President of Business Development and Strategy of Fredrick Health.

37.     On or about April 1, 2021, Klienhanzl offered the job of Vice President of Business Development and Strategy for Fredrick Health located in Fredrick, Maryland.

38.     The job with Fredrick Health would require Sherwood to sell his home in Winchester, Virginia and relocate himself and his family to Fredrick, Maryland at considerable

9

time, trouble, and expense. It also required Sherwood's wife, who was a teacher in Virginia, to find a new job in Maryland and become certified to teach in Maryland.

39.     On or before April 1, 2021, before accepting the Fredrick Health job, Sherwood first spoke to Philips, who had knowledge of and influence on the Plan including the Non-Compete Provision and he knew that Sherwood's job had been eliminated. Sherwood informed Philips of his new job opportunity and his general job duties with Fredrich Health in Fredrick, Maryland. Phillips then told Sherwood that he did not see any conflict with Sherwood taking the position with Fredrick Health, in Fredrick, Maryland, some 55 miles by car from Winchester, Virginia.

40.     By email dated April 6, 2021, at 12:17 p.m., Savage told Sherwood, in part:

I had a conversation with Mark Nantz, and both he and I have discussed with Skip. Unfortunately, we are unable to lift the non-compete condition for Frederick Healthcare-or any other healthcare organization within the 70 mile radius.... If you accept an offer with another organization outside of the 70 mile radius, then the severance would be applicable.

See Ex. A, VHS 000084, 21-23.

41.     At this time, neither Savage nor Nantz had any information from Sherwood as to his job duties or tasks to be undertaken at Fredrick Health, his specific job duties at VHS, or whether VHS and Fredrick Health actually competed with or were in competition with each other. Savage's only statements then, and at all times, and VHS's position now, is that Fredrick Health is within a 70-mile radius of WMC and automatically disqualifies Sherwood from his severance benefits under the Plan.

42.     Sherwood received one month's severance for the month of April 2021, and he began working at Fredrick Health on or about May 3, 2021.

43.     By letter dated May 4, 2021, Savage told Sherwood he had forfeited his severance benefits due to his work at Frederick Health. See Ex. A, VHS 000024-25.

10

44.     Thereafter, Sherwood filed a 17-page verified Complaint with exhibits under seal in the Circuit Court of the City of Winchester, seeking determination of the enforceability of the Non-Compete Provision of the Plan and especially due to there being no time limits as to the Non-Compete. See Complaint at Ex. A., VHS000117-133 (without cited attachments).

45.     VHS, by its local counsel at Flora Pettit, PC, moved for removal of said Complaint to this Court and its dismissal in Case No. 5:21-cv-00033. Thereafter, Sherwood moved for voluntary dismissal of his action removed to federal Court. See Ex. A, VHS00026-27.

46.     By letter dated May 28, 2021, Savage advised Sherwood that VHS was in receipt of his Complaint filed April 30, 2021 contesting the enforceability of the noncompetition provisions set forth in Exhibit A of the Plan, and although (voluntarily) withdrawn (from USDC in Harrisonburg), Savage elected to treat Sherwood's Complaint as a claim for benefits under the Plan and treated Sherwood's Complaint a a claim for benefits under the Plan. Savage advised that Sherwood he can file a claim to appeal the denial for his benefits with the Plan Administrator. See Ex. A, VHS00028-30.

47.     On or about June 24, 2021, Sherwood, with the assistance of numerous unidentified experts in the health care field, filed his first appeal of the denial of his severance benefits with the Plan Administrator. Sherwood made the following arguments set forth herein of the relevant issues and did not waive his arguments of his initial Complaint acknowledged by Savage's letter of May 28, 2021. See Ex. B, VHS00031-86.

48.     VHS inhouse counsel, Walter P. Sowers, II, Esq. on behalf of Valley Health, Plan administrator, Valley Health Severance Benefit Plan denied Sherwood's severance by letter dated October 22, 2021. See Ex. C., JS2000001-62, JS000228-234.

11

49.     Sherwood by letter dated December 21, 2021 sought an appeal of said VHS denial decision dated October 22, 2021. See Ex. D., JS000063-67, JS000228-231,103-116.

50.     Savage on behalf Valley Health, Plan Administrator, Valley Health Severance Benefit Plan again denied Sherwood's appeal by letter dated April 20, 2022, which letter was returned and resent to Sherwood by letter dated May 19, 2022. See Ex. E., JS200068-87, VHS000103-116, 190-251, JS2000088, VHS00001-183.

## C.     **Arguments of the Relevant Issues**

51.     As explained below, the Non-Compete Provision is both unenforceable and inapplicable to the facts of this case. The Non-Compete Provision fails to set a time limit, and this failure makes many, if not all, of the related restrictions and covenants of the ISRA and SSRA and the Plan Sherwood is bound to permanent and it is otherwise over broad, restrictive and contrary to public policy. Further, the Non-Compete Provision is vague and ambiguous, and otherwise fails to define the terms "competes" or "competition." Because these terms are susceptible to two or more reasonable interpretations, the Non-Compete Provision contains a vague or ambiguous term. The ambiguity renders the alleged agreement too indefinite—even after the consideration of extrinsic evidence—to determine the parties' mutual intent. Therefore, the Non-Compete Provision cannot be enforced due to the absence of any discernible meeting of the minds.

52.     In addition, the Non-Compete Provision does not limit or condition competition in terms of labor, products, or services, such as competition in a specific patient healthcare market, physician labor market, or other healthcare services. The Plan merely states: "By way of example, *but not by way of limitation,* organizations that have similar purposes to and compete with the Company include hospitals, health care systems, physician management organizations, physician practices and managed care organizations." (emphasis added).

12

53. The interpretation of these undefined terms—"competes" or "competition"—is governed by Virginia common law of contracts and non-compete law and may be governed by the federal common law of contracts. *Denzler v. Questech, Inc.,* 80 F.3d 97, 101 (4th Cir.1996) ("When interpreting ERISA plans, courts look to the federal common law of contracts."); *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 148 (1985) (referring to ERISA plan benefits as "contractually authorized benefits"). However, state common law serves as a useful guidepost. *Id. See also Burnham v. Guardian Life Ins. Co.,* 873 F.2d 486, 489 (1st Cir.1989) (observing that when construing the terms of contracts that are governed by federal common law, we are guided by "common-sense canons of contract interpretation").

54. A term is ambiguous when the term is susceptible to more than one reasonable interpretation. *See, e.g., Goodman v. Resol. Tr. Corp.,* 7 F.3d 1123, 1126 (4th Cir. 1993).

55. Non-compete provisions built into ERISA plans are unambiguous when they narrowly define what it means to "compete." *See, e.g., Rudasill v. WorldWay Corp.*, 55 F. Supp. 2d 403,409 (W.D.N.C. 1999), *aff'd sub nom. Kocan v. ABF Freight Sys., Inc.*, 229 F.3d 1143 (4th Cir. 2000) (limiting competition in forfeiture clause of ERISA benefit plan to "competes with any business conducted by Company *in an area where such business is being conducted by Company*" (emphasis added)); *Wall v. Alcon Labs. Inc.*, 551 F. App'x 794, 799 (5th Cir. 2014) (limiting competition in forfeiture clause of ERISA benefit plan to "competes with *the products and manufactured and sold or services provided by [the Company]*" (emphasis added)).

56. In this case, by contrast, the Plan does not define or narrow the terms "compete" or "competition." More than one reasonable definition of the terms might have the effect of narrowing the reach of the Non-Compete Provision. For example, one reasonable interpretation is that Sherwood forfeits the benefits under the Plan if Sherwood's new employer "competes with [VHS]"

13

with respect to patient services. Indeed, absent patient services, neither VHS nor any hospital for that matter would have a business to run. So construed, Frederick Health would compete with VHS if Frederick Health and VHS vie for the same pool of patients to provide the same or similar services.

57.     While accepted canons of construction forbid the balkanization of contracts for interpretive purposes, even when the phrase "competes with the Company" is read in the full context of the Plan, the language is far from clear. Thus, because the language of the Plan fails to support one interpretation over the other, the Non-Compete Provision is ambiguous on its face.

58.     Virginia law resolves "contractual vagaries in one of three ways." *Smith v. Smith,* 43 Va. App. 279,287, 597 S.E.2d 250,254 (2004). "First, if no patent or latent ambiguities exist, a court should enforce the plain meaning of the contractual language without resort to extrinsic evidence." *Id.* "Second, if an ambiguity exists, a court should still enforce the contract if the real meaning of the ambiguous provision can be discerned from extrinsic evidence." *Id.* "Third, if an ambiguity renders the alleged agreement too indefinite-even after the consideration of extrinsic evidence-for the court to determine the parties' intent, the contract cannot be enforced due to the absence of any discernible meeting of the minds." *Id.* Thus, if an ambiguity exists in a contract, the ultimate resolution of it typically will turn on the parties' intent.

59.     Exploring the intent of contracting parties often (but not always) involves marshalling facts extrinsic to the language of the contract documents. *See Chavis v. Plumbers & Steamfitters Loc. 486 Pension Plan, No. CV ELH-17-2729,* 2020 WL 1503679, at *32 (D. Md. Mar. 27, 2020) (finding that ERISA administrator should comb extrinsic evidence, if available, where ambiguity in plan exists). When this need arises, these facts, together with the reasonable inferences extractable therefrom, are together superimposed on

14

the ambiguous words to reveal the parties' discerned intent.

60.    There is no extrinsic evidence in this case to shed even the dimmest light on the term "competes" as used in the Non-Compete Provision. VHS has no official or authoritative position as to what constitutes actual or threatened real "competition" within the meaning of the Plan. VHS shared no information of any kind with Sherwood about what it believed competition may mean. Significantly, VHS has produced conflicting interpretations of the ambiguity in the Plan.

61.    For instance, when Sherwood initially spoke with Philips concerning the job offer from Frederick Health, Philips stated that VHS did *not* compete with Frederick Health and vice versa. Philips, who was the President of WMC and who was interpreting the term "competes" according to market patient-base competition. Sherwood relied on Philips' interpretation of the Plan by accepting the job offer from Frederick Health.

62.    When Savage arrived at the opposite conclusion *after* Sherwood had already accepted the job with Frederick Health merely because it was within the 70-mile radius despite the non-competition of the two systems and with no knowledge of Sherwood's position at Fredrick Health, she did not specifically state in her email how she was interpreting the terms "competes" or "competition." Savage was not likely interpreting the term in the same fashion as Sherwood and Philips, or according to market patient-base competition. Indeed, she would have had no basis to draw this conclusion because Frederick Health is not in the same patient network as VHS. Further, there is no evidence to suggest that Savage and VHS interpreted the term "competes" according to labor force competition, *i.e.,* competition over physicians and hospital administrators. Savage never alluded to Sherwood in her verbal conversations and emails that VHS competed with Frederick Health.

15

63. Rather, Savage implicitly concluded that *any* hospital in the 70- mile radius *de facto* competes with VHS. But this is not a *reasonable* interpretation of the term "competes." Competition necessarily encompasses some form of *actual rivalry* between two entities over a particular good or service. Where actual rivalry is lacking, imagined competition based purely upon arbitrary geographical barriers will not suffice, for fictional competition is no rivalry at all. *See generally United States v. Cont'l Can Co.*, 378 U.S. 441, 452 (1964) (observing that the goal in defining a relevant product market is not to obfuscate or confuse market realities, but rather to "recognize competition where, *in fact,* competition exists.").

64. Savage's interpretation of "competes" is also inconsistent with the plain language and purpose of the Non-compete provision, which would be meaningless if an employee, who is retained by a company that never has competed and never will compete with VHS, somehow violates the provision and thereby forfeits the entirety of his benefits under the Plan and is subject to a claim of breach of the Plan restrictions.

65. In sum, the ambiguity renders the Non-Compete Provision too indefinite even after the consideration of extrinsic evidence-to determine the parties' intent. Therefore, the Non-Compete Provision is unenforceable due to a lack of meeting of the minds. *See, e.g., Collins v. Ralston Purina Co.*, 147 F.3d 592, 598 (7th Cir. 1998) (observing that an ambiguous ERISA provision is unenforceable unless extrinsic evidence resolves the uncertainty). Additionally, VHS is estopped from interpreting the Plan against Sherwood, because Sherwood relied, to his detriment, on Philips' interpretation of the ambiguity. *See, e.g., Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1286 (11th Cir. 1990) (applying equitable estoppel principles to preclude drafter's second interpretation of ambiguous ERISA Plan, where drafter invoked two contradictory interpretations of ambiguous term and plaintiff relied upon

16

the first interpretation); *Cagle v. Bruner,* 921 F. Supp. 726, 735 (M.D.Fla.1995), *aff'd,* 112
F.3d 1510 (11th Cir.1997) (stating that the federal common law claim of equitable estoppel
may be applied when an employee relies, to his detriment, on an interpretation of an
ambiguous provision in a plan by a representative of that plan).

## D.   **Frederick Health does not "Compete" with VHS**.

66.    Even assuming (but not conceding) the Non-Compete Provision is not
ambiguous, the clause was never triggered so as to forfeit Sherwood's benefits. The Non-
Compete Provision provides for the forfeiture of accumulated severance benefits in the event
that: (1) Sherwood leaves VHS and takes a position with a company that "*competes*" with VHS;
(2) the competing company is substantially similar to VHS; **and** (3) Sherwood's new job is in
a "Covered Capacity," meaning that his new position with the competing company has
substantially similar tasks to his prior position with VHS. All three conditions must be satisfied
to trigger the Non-Compete Provision. Here, the first and third conditions are not met.
Frederick Health does not directly or indirectly compete with VHS and Sherwood's position
at Frederick Health is not substantially similar to his position at VHS.

67.    Frederick Health and VHS do not compete as they have different patient markets
and Sherwood's arguments herein are based on expert opinions of two health care experts, one
based at Johns Hopkins and one retired long term chief executive officer in the health care field.
VHS was advised by separate letter during the appeal process to the Plan Administrator of the
health care experts used for the information in his appeal(s).

68.    VHS owns and operates approximately six (6) hospitals in Virginia and West
Virginia: one (1) major hospital located in Winchester, Virginia, one (1) hospital with less than
fifty patient beds in Warren County, Virginia, and four (4) critical access hospitals that have

17

less than 25 beds located in Virginia and the eastern panhandle of West Virginia. From that pool of hospitals, *none* are in the State of Maryland. VHS operates only a blood drawing station known as Valley Health Lab Services and a small family practice physicians office known as Valley Health War Memorial Hospital Family Medicine in Hancock, Maryland, which is approximately 45 miles from Frederick, Maryland.

69.    According to industry standard, Frederick Health does not lie in the "competitive zone" of VHS. A medical provider's competitive zone, as drawn by the Dartmouth Atlas Project, is known as its Hospital Referral Region (HRR). HRRs have been used in the medical industry throughout the United States to understand how patients access healthcare. As seen in Figure 1, the HRR for VHS has no overlap with the HRR for Frederick Health.

18

**Figure 1**

Dartmouth Atlas: No Overlap Between VHS and Frederick Health Hospital Referral Region (HRR).



Source: Medical Discharges - Dartmouth Atlas of Health Care: https://www.dartmouthatlas.org/interactive-apps/medical-discharges/

70.     Based on VHS's patient market and service area, Frederick County, Maryland is not included in VHS's primary, secondary, or tertiary service area.

71.     As shown in Figure 2, Frederick Health's market definition is limited to ZIP codes located solely in Frederick County, Maryland, and has no overlap with VHS's patient market. Nothing suggests that the patients in VHS's patient market are willing to pay higher out-of-pocket expenses to travel out-of-network to Frederick Health, or vice versa.

**Figure 2**

Frederick Health Market Definition (No Overlap with any VHS Services)



72.    Figure 3 represents Frederick Health's current market share. Frederick Health

defines its service area solely as Frederick County, Maryland.  Frederick Health captures

seventy percent (70%) of Frederick County's market, while those patients who need more advanced care

that is outside of service capabilities of a community hospital are provided those services in Washington D.C.

or Baltimore, Maryland (see Washington D.C. HRR).  Frederick Health's patient market generates

from its immediate local service area in Maryland, which lies outside VHS's HRR.  *See* Figure

1.

## Figure 3

### Frederick Health Market Share

#### Executive Summary

|                           |         |        |        |        | 2020Q1 |         |
|---------------------------|---------|--------|--------|--------|--------|---------|
|                           |         | ·.     |        | 5t.·   |        |         |
| Home Facilities           | 14,850  | 70.7%  | 13 908 | 69.4%  | 12 563 | 70.4%   |
| Lost Cases: In Service Area | 0     | 0.0%   | 0      | 0.0%   | 0      | 0.0%    |
| Lost Cases: Out-Migration | 6,159   | 29.3%  | 6 133  | 30 6%  | 5,26:  | 29 ·:.  |
| Total Market              |         | 21,009 |        | 20,041 |        | 17,849  |

Service Area: Frederick Memorial Hospital

Source: Maryland Inpatient (Frederick Memorial Hospital) (Available through 2020Q4)

Home Facilities: Frederick Memorial Hospital

### E.   Frederick Health exists under a separate and independent healthcare finance and reimbursement market than VHS.

73.   Hospitals in Maryland are subject to a different healthcare reimbursement model than hospitals in Virginia. Unlike hospitals in Virginia and West Virginia where VHS maintains its patient market, hospitals in Maryland, such as Frederick Health, are subject to the Centers of Medicare and Medicare Innovation Project recognized as the "Maryland Model." The Maryland Model innovation initiative is focused on reducing the "The Total Cost of Care Model," which includes the appropriate reduction of inpatient hospital-based care. Unlike other states, hospitals in Maryland do not get incremental reimbursement if additional care is provided. Under this system, hospitals operate under a global budget reimbursement (GBR), which is premised upon a partnership between the Centers of Medicine and Medicaid

Services (CMS), the State of Maryland, and private insurance companies to reduce healthcare expenditures. GBR provides a fixed amount of revenue for each Maryland hospital.

74.     Maryland thus no longer has the "fee-for-service" payment system, which is present in Virginia and West Virginia. Rather, hospitals in Maryland, like Frederick Health, are fiscally restrained in their per capita hospital revenue based upon the fixed amount provided by the State. Unlike VHS, therefore, Frederick Health has no economic incentive to increase unnecessarily or inappropriately inpatient volumes that would increase operational costs, because there would be no revenue from the state to recover the expense.

75.     The difference between the two medical finance structures in Maryland and the surrounding states, including Virginia and West Virginia, also poses significant entry barriers for medical providers. There is no evidence here that Frederick Health would have any real incentive to compete (whatever that term may mean) with VHS. VHS exists in a separate medical network and operates under a different medical finance structure. Due to the difference in the medical finance structure, Frederick Health has no need to take into consideration the price of medical operations of VHS in formulating its own pricing policy. Similarly, Frederick Health would not and does not compete with VHS - with respect to either patients or medical labor force - because doing so would require Frederick Health to target an out-of-state medical market in which it cannot realistically increase its revenue stream.

## F.    Frederick Health does not compete with VHS's patient services because VHS has different levels of clinical services than Frederick Health.

76.     VHS provides advanced clinical services such as heart surgery and advanced cardiovascular care services, mechanical thrombectomy for stroke care, complex spine services, and acute rehabilitation services. Frederick Health does not offer these advanced services. Instead, Frederick Health offers only basic services that are consistent with the needs of its local

22

community. To provide more advanced services, Frederick Health collaborates and interacts with hospitals in Baltimore, such as Johns Hopkins and University of Maryland Health System. *See* Figure 4.

**Figure 4**

**Comparison: VHS "Tertiary Medical Center" versus Frederick Health "Community Hospital"**

| Service Focus | VHS Winchester Medical Center Tertiary Care Center | Frederick Health Hospital Community Hospital |
|---|---|---|
| Cardiovascular | Conventional Heart Surgery Trans-catheter Aortic Valve Repair Trans-Cather Mitral Repair Advanced Heart Failure Clinic Structure Heart Advanced Coronary Ablations | Not Offered at Frederick Health |
| Neurosciences | Mechanical Thrombectomy Complex Spine with Intra-operative CT Epilepsy | Not Offered at Frederick Health |
| Rehabilitation | Acute Rehabilitation Center | Not Offered at Frederick Health |
| ED | Level II Trauma Center | Not a Trauma Center |
| Bariatrics | Robotic Bariatrics | Not Offered at Frederick Health |
| Pulmonology | ION Interventional Lung Biopsy | Not Offered at Frederick Health |
| Gastroenterology | Esophageal Ultrasound (EUS) | Not Offered at Frederick Health |

77.    Since the two companies approach strategic operations differently, Frederick Health does not draw upon the same strategic considerations as VHS. Frederick Health does not offer patients the many invasive or complex operations that VHS offers patients, such

as heart surgery, complex spine surgery, mechanical thrombectomy, and acute rehabilitation services. *See* Figure 4. Thus, Frederick Health does not focus its market strategy on acquiring the same products and professionals in these fields.

78.     Additionally, Frederick Health's strategic operations are substantially different than VHS's operations insofar as Frederick Health focuses on establishing market growth within the unique Maryland medical industry. Frederick Health employs cost-effective strategies to partner with local Maryland medical facilities, including Johns Hopkins. On the other hand, VHS focuses its strategic operations on growing clinical services throughout its own patient market, which as explained, lies separate and apart from Frederick Health's own patient market.

79.     While working for VHS, Sherwood did not contemplate any strategic operations to approach the Maryland medical market. When WMC cardiologists did request an initiative in Hagerstown, Maryland, Sherwood connected them with VHS executives who had responsibility for this role. VHS executive decisionmakers, including the CEO, killed the initiative in its infancy before it could even gain any traction. Sherwood's new role with Frederick Health as Vice President of Business Development and Strategy requires new strategies narrowly tailored to Frederick Health's unique Maryland patient market, as well as a detailed understand of the Maryland Regulated Payment Systems, which he did not know or experience at VHS. Therefore, Frederick Health does not compete with VHS for the same patient services.

80.     VHS has provided no evidence to refute Sherwood's use of the health care industry standard of Dartmouth Atlas Data used herein by Sherwood showing the non-competition of the two health systems. Neither VHS's denial of October 22, 2021, nor its

24

denial of April 20, 2022, even mention, much less discuss, the Dartmouth Atlas Data issue. VHS sticks to its 70-mile hospital argument with no factual support.

## G.   **Sherwood's two positions concern different tasks.**

81.   Sherwood's position at VHS was Vice President of Operations and Professional Services at Winchester Medical Center (WMC). The operational and strategic goals were created and directed by the President of WMC or VHS leadership. Sherwood's role was focused on ensuring regulatory compliance for clinical care delivery, maintaining quality performance by supporting directors and inter-professional teams, and enhancing work environment and organizational loyalty.

82.   Sherwood had no signed job description while employed with VHS, and first saw the alleged revised job description during this litigation. Further, Sherwood disputes a majority of the declarations made on behalf of VHS in it April 21, 2022 denial by Phillips of Sherwood's job functions, impacts and conversations.

83.   Sherwood was responsible for managing over $225 million in budgets and supports roughly 700 employees at VHS. Meanwhile, Sherwood manages approximately $1.2 million in budgets and supports just seven (7) employees at Frederick Health.

84.   On the other hand, Sherwood's position at Frederick Health as Vice President of Business Development and Strategy differs from his previous role with VHS. At Frederick Health, Sherwood is leading and *creating* the strategic processes alongside senior leadership and external partners, instead of simply implementing those processes. Unlike his previous role with VHS, Sherwood directly reports to Frederick Health's CEO instead of to the hospital President of Operations. His tasks at Frederick Health differ from his

25

tasks at VHS insofar as Sherwood went from an operational role focused on implementation while at VHS to a support and advisory role at Fredrick Health.

85.    Sherwood's new position at Frederick Health is primarily responsible for developing communication strategies to enhance Frederick Health's market position and growth in the local Maryland health market. Sherwood is also responsible for performing and maintaining competitive analyses on local companies' market offerings, leading strategic decisions concerning mergers and acquisitions, and participating in discovery and analyses of local business opportunities.

86.    While Sherwood's position at VHS entailed overseeing and implementing strategies in fourteen different medical departments, his position at Frederick Health consists of developing high-level strategies rather than implementing them. His previous role at VHS had nothing to do with corporate communications. Instead, his previous role at VHS required him to execute strategic plans internally within fourteen different medical departments at WMC. Sherwood's new role at Frederick Health does not include executing strategic plans within the various medical departments. Rather, at Frederick Health, Sherwood directs overall corporate *communications* with internal and external stakeholders, including local donors, agencies, development organizations, the media, and staff. For example, unlike in his previous role at VHS, Sherwood creates and develops Frederick Health's market communications for local public and private donor audiences, including marketing materials, website content, and social media outreach, which is not focused on VHS's patient market.

87.    Because Sherwood is not and did not become employed by a competing company and Sherwood's position with his new employer is not substantially similar in any

26

respect to his position with VHS, the denial of the benefits accorded under the Plan was unreasonable, erroneous and arbitrary and capricious.

88.     Sherwood therefore respectfully requests that the VHS decision under the Non-Compete Provision be found violative of Virginia law as required by the Plan. Further, the VHS decision is unreasonable, arbitrary and capricious and lacked sufficient evidence, and was an abuse of discretion due to the structural conflicts of interest of VHS both evaluating Sherwood's benefit claim and being responsible for paying said benefits.

89.     As to the structural conflict with VHS operations and Sherwood's denial of severance benefits (and also Sherwood, though not a patient, being "in the middle" of said conflict per quote below by Nantz), VHS has experienced significant financial short falls over the last two years and is currently suing Anthem Health Plans of Virginia, Inc. in this Court for a claimed $15,000,000.00 ($20,000,000.00 demand per CM/ECF) in unpaid costs. See Nantz's Anthem case related interview remarks made to the Winchester Star on Thursday, January 19, 2023 noting VHS paying more for employment and services during the COVID-19 pandemic, that labor costs have risen nearly 30%, VHS's closing of health care related facilities in Woodstock, Front Royal and in Berkely Springs, WVA as of February 1, 2023, that Valley Health doesn't have a lot of extra money to get them through difficult times beyond savings, which has been dwindling through the pandemic and including the statement: "The difficult thing is that the people in the middle are the patients.": https://www.winchesterstr.co/winchesterstar/valley-health-is-closer-to-moving-out-of-network-with-anthem/article_a3b77cc0-8378-57ba-9f39-cf8902f92980.html.     See also USDC court case of *Valley Health System v. Anthem Health Plans of Virginia, Inc.*, filed (removed by Anthem from Winchester Circuit Court, CL220000472-00) on November 7, 2022 in this Court, case number 5:22-cv-00065 EKD.

27

90.    Sherwood respectfully requests this Court to allow discovery in this case and to

hold a de novo hearing, and find VHS non-compete terms set forth the herein to violative of

Virginia law and not governed by ERISA, and to Order VHS to disburse his denied benefits for

May 2021 and continue rendering timely the remaining four payments due from the Plan in

the sum of $118,750.00 plus pre-judgment interest, along with his reasonable attorney fees

and costs.

## CAUSES OF ACTION

### COUNT I:

### NON-COMPETE PROVISION VIOLATES VIRGINA LAW AND SAID SEVRENCE BENEFIT PLAN IS NOT COVERED BY ERISA

91.    Sherwood incorporates by reference and re-alleges each allegation set forth above.

92.    As stated above, Virginia law governs the interpretation of the SSRA, at paragraph

5.11, the Plan, at paragraph 10.6, and governs the interpretation of the Non-Compete Provision at

Ex. A under the Plan.

93.    The standard this Court applies in reviewing a covenant not to compete is well

established. A non-competition agreement between an employer and an employee will be

enforced if the covenant (1) is narrowly drawn to protect the employer's legitimate business

interest, (2) is not unduly burdensome on the employee's ability to earn a living, and (3) is not

against public policy. *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 270 Va.

246,249, 618 S.E.2d 340, 342 (2005).

94.    The analysis of the three interrelated factors cited in *Omniplex* requires

consideration of the restriction in terms of (1) function, (2) geographic scope, and (3) duration.

*Simmons v. Miller*, 261 Va. 561,581,544 S.E.2d 666, 678 (2001).

28

95.     Because such restrictive covenants are disfavored restraints on trade, the
employer bears the burden of proof and any ambiguities in the contract will be construed in
favor of the employee. *Id.*

96.     Covenants not to compete have been upheld only when employees are
prohibited from competing directly with the former employer or through employment with a
direct competitor. *Id.*

97.     A reviewing court determines first whether the covenant not to compete is
facially reasonable and enforceable, according to the three factors enunciated in *Omniplex* and
the corresponding three factors enunciated in *Simmons.* If it is not, that concludes the analysis,
and the covenant must be struck. *Omniplex,* 270 Va. at 249, 618 S.E.2d at 342.

98.     If the reviewing court finds that the covenant not to compete may be facially
reasonable, the court then assays the covenant based upon "the legitimate, protectable interests
of the employer, the nature of the former and subsequent employment of the employee . . .
and the nature of the restraint in light of all the circumstances of the case." *Modern
Environments,* 263 Va. at 494-95, 561 S.E.2d at 696.

99.     Virginia courts have routinely rejected the invitation "to become the
employer's scrivener" and modify the agreement so that it complies with law,
otherwise known as "blue penciling." *Northern Virginia Psychiatric Group, P.C. v. Halpern,*
19 Va. Cir. 279, 282 (1990).

100.    VHS has unequivocally stated its intent to deny and has denied Sherwood of
five months of salary afforded under the Severance Agreement and Plan because Sherwood
accepted an offer of employment with Frederick Health.

29

101.    A declaratory judgment as to the rights and duties of the parties under the Non-Compete Provision is appropriate in this case because it will terminate the controversy giving rise to the proceeding.

102.    The Non-Compete Provision is not narrowly drawn and therefore facially void and unenforceable because: (1) its function sweeps too broadly by encompassing services and/or entities that no not directly or indirectly compete with VHS; (2) its scope is not limited to the geographic area in which VHS actually does business or the area in which VHS's competitors do business with VHS; and (3) its time is not limited in duration.

103.    The Non-Compete Provision is not limited in time as it contains no duration. Thus, the entire Non-Compete Covenant is facially void and unenforceable, as it circumscribes Plaintiff's employment into perpetuity for the rest of Plaintiff's lifetime. *See Jennings v. Pomeroy*, 8 Va. Cir. 111 (1984) (Whiting, J.) (finding facially void and unenforceable a non-compete agreement because it contained no limitations time period and refusing to blue-pencil a reasonable limitations time period).

104.    Plaintiff's new employment with Frederick Health does not violate the second clause of the Non-Compete Provision, which requires that Plaintiff's new employment not "compete[] with the Company."

105.    The Non-Compete Covenant is overly broad in terms of scope, geography, and time, and unduly burdensome on Plaintiff's ability to work. The Non-Compete Covenant broadly prohibits all forms of employment in Plaintiff's line of work ("Covered Capacity"), *viz.* senior operations management for major healthcare facilities, in all of Northern Virginia, approximately 90% of the State of Maryland, and 100% of the

Eastern Panhandle of West Virginia. Exhibit F (map of Eastern Panhandle of West
Virginia).

106.    Monetary damages alone are an inadequate remedy in this case. Monetary
damages can only be sought *after* the harm in this case has been done; that is, after VHS denies
Sherwood the balance due of $118,750.00.

107.    The harm Sherwood faces is neither remote nor speculative because VHS has
already indicated its clear intention to deny Sherwood the $118,750.00 balance based upon
Sherwood's acceptance of employment with Frederick Health.

108.    Further, harm, if any, suffered by VHS is de minimis. VHS will not forego any
competition or business as a result of Sherwood's new position with Frederick Health. Indeed,
the effect on Sherwood is he will not receive his VHS severance benefits due him after VHS
intentionally eliminated his position at WMC and causing him to look for a new job, sell his
home in Winchester, Virginia and move himself and family to Fredrick, Maryland while still
remaining under severe VHS employment relate covenants and restrictions with no time limits.

109.    Public policy favors protecting Sherwood's ability to earn a living and receive his
earned severance benefits over VHS's interest to reduce and/or eliminate non-existent
competition with Frederick Health in Frederick, Maryland.

110.    The award of an injunction in this case is in the public interest. The public has
an interest in vitiating overly broad and unduly burdensome non-compete covenants that serve
as an unnecessary restraint on free trade. In this respect, the public has an interest in preventing
injury to constitutionally protected life, liberty, and property, which is the foundation for this
Court's equitable jurisdiction. Finally, the public has an interest in preventing the multiplicity
of suits, which would likely occur if VHS is permitted to enforce the Non-Compete Provision

31

against Sherwood and thereby divest him of $118,750.00 of his severance benefits and still keep its restrictions on Sherwood in force for a life time due to no time limits.

111.    Under the applicable legal principles, ERISA applies only to "employee benefit plans"; does not govern all benefits provided to employees by employers. *See Caffery v. Four Oaks Bank & Trust Co.*, No. 5:10CV341, 2011 WL 2580674, at *11 (E.D. N.C. Jun. 29, 2011).

112.    ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." *See* 29 U.S.C. § 1144 (a).

113.    ERISA preempts a state common law action if the plaintiff's claim "relates to" an employment benefit plan governed by ERISA, or if the employment agreement at issue is itself an employee benefit plan governed by ERISA. See *Venezuela v. Massimo Zanetti Beverage USA, Inc.*, 525 F. Supp. 2d 781, 788-89 (E.D. Va. 2007).

114.    An employee benefit arrangement constitutes a "plan" governed by ERISA where the payment benefits "require an ongoing administrative program the meet the employer's obligation." See *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11 (1987).

115.    To determine whether there is an ongoing administrative scheme, lower courts generally consider four factors:

> (1) The amount of managerial discretion granted in paying the benefits and whether a case-by-case review of employees is needed;
> (2) Whether payments are triggered by a single, unique event in the course of business or on a recurring basis;
> (3) Whether the employer must make a one-time, lump-sum payment or continuous, periodic payments;
> (4) Whether the employer undertook any long-term obligations with respect to the payments.

See *Caffrey*, 2011 WL 2580674, at *4-5.

116.    In consideration of the above factors, the Plan at issue does not "relate to" an employee benefit plan used in the context of ERISA preemption, nor does the Plan itself

32

constitute an employee benefit plan governed by ERISA, and further the Plan is specifically governed by the law of Virginia.

117.    This case is a contract dispute involving the determination of whether the Plan has been breached by Sherwood. Under the analysis of the four factors above, and the case law of *Anderson v. Bank of Hampton Roads, Inc,* 2015 WL12806531 (E.D. VA Nov. 6, 2015), this Plan is not governed by ERISA as there are minimal decisions to determine Sherwood's eligibility for payment benefits, there was one single, unique event triggering payment, there were only six (6) payments to make over a short period of time, and there are no long-term payment obligations of the employer.

118.    Sherwood respectfully requests this Court declare as facially invalid and unenforceable the Non-Compete Provision due to its lack of a temporal restriction and restraint on free trade for an indefinite period of time; and declare, under the circumstances of this case, Sherwood's employment with Frederick Health does not violate the Non-Compete Provision; permanently enjoin VHS from ever directly or indirectly enforcing the Non-Compete Provision, as it is void, unenforceable, and/or non-applicable to Sherwood's employment with Frederick Health; award Sherwood judgment against VHS in the sum of $118,750.00 with prejudgment interest at the rate of six percent (6%) under Virginia law from May 4, 2021 until paid; award Sherwood's reasonable attorney fees and costs pursuant to Rule 3:25 of the Rules of the Supreme Court of Virginia; grant Sherwood any and all further relief allowed by law and that equity deems meet including any amendments to this claim under Virginia law; and find that this Court lacks subject matter jurisdiction to address ERISA.

33

## COUNT II

## IF THE PLAN IS COVERED BY ERISA, THE PLAN DETERMINATION DENYING SEVERANCE BENEFITS IS VIOLATIVE OF THE LAW

119.   This count is pled in the alternative.

120.   Sherwood incorporates by reference and re-alleges each allegation set forth above.

121.   VHS's decision denying Sherwood his severance benefits was arbitrary and capricious and an abuse of its authority.

122.   VHS and Frederick Health do not compete with each other even though they are within 70 miles of each other, as they are different health care systems governed by and are in different states and provide different medical services to different patient populations and are based on different funding and profit/non-profit models.

123.   There is an inherent conflict between the Plan and VHS as they are both funded by the same common sources and there is no specified and separate fund for severance payment under the Plan.

124.   There is an established negative bias towards Sherwood by VHS, which does not allow for a reasonable interpretation of the Plan and has been used to deny to Sherwood his benefits.

125.   Sherwood does not engage in his current job duties or tasks that are in any way the same or substantially similar with his former job duties at VHS and which duties were eliminated and given to three other employees.

126.   As set forth more fully above, the Non-Compete Provision is governed by and violative of the common law of Virginia concerning non-competes as it fails to have a time limit in its provisions and is otherwise overbroad and unenforceable.

34

127.   There are genuine issues and disputes of material facts as stated herein in that the parties disagree as to the competition between VHS and Fredrick Health and as to the current job duties of Sherwood as being any of the same as his former job duties at VHS.

128.   Whereas there are disputed issues of material facts in this case, Sherwood respectfully request this Court to schedule a bench trial on the merits of this case where a *de novo* determination needs to be made as to the finding of facts in dispute, such as the issue of competition and job duties and credibility determinations of witnesses, and allow Sherwood's experts to testify as to the competition and covered work capacity issues, the reasonableness of the Plan's denial of benefits, the financial conflicts between VHS and the Plan, and other related matters. *See Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951 (4th Cir. 2022).

129.   Sherwood also respectfully requests this Court to undertake a *de novo* review of benefits under ERISA and to conduct a careful examination of the voluminous administrative record to determine whether Sherwood is entitled to benefits; to undertake a bench trial pursuant to Rule 52 of the Federal Rules of Civil Procedure to not only assess the credibility of witnesses, but determine the appropriate weight to assign such testimony and other evidence; to find that Sherwood is not disqualified to receive the balance of his severance plan because he works for Frederick Health as Frederick Health does not compete with VHS and Sherwood's job duties at Frederick Health do not disqualify him; to grant Sherwood the balance of his severance benefits, his attorneys' fees and costs, and pre-judgment interest at six percent from May 4, 2021 to the date of judgment; and to grant leave to amend and to enter all appropriate Order to grant Plaintiff all necessary relief and for any and all further relief under law and that equity deems met.

35

Respectfully submitted,

**JAMES B. SHERWOOD**
*Plaintiff*

By:

James B. Thorsen, Esq.
VSB No. 18113
Attorney for Plaintiff
THORSENALLEN LLP
5413 Patterson Avenue, Suite 201
P.O. Box 17094
Richmond, Virginia 23226
Telephone: (804) 447-7234
Facsimile: (804) 447-7813
E-mail: jthorsen@thorsenallen.com